BOYKIN & LANG *v.* W. A. SHAFFER.

The Act of Congress admitting Louisiana into the Union which provides, that it shall be a condition upon which said State is admitted into the Union, that the river Mississippi and the navigable rivers and waters leading into the same and into the Gulf of Mexico shall be common highways, and open to the inhabitants of the States and Territories of the Union, was not intended to apply to streams only capable of an imperfect navigation in time of floods and very high water.

The right to charge toll for the use of a lock on a water course is a franchise which the sovereign alone can confer.

The Act of the Legislature approved May 25th, 1856, entitled " An Act providing for the separation of the Lafourche and Terrebonne Navigation Co. from the Barataria Canal Co., and determining the condition of said separation" is unconstitutional and void.

There is no law which prevents a corporation from causing some of its works to be built with an understanding with the contractor that he shall be permitted to reimburse himself by the receipt of the toll arising from the same.

APPEAL from the District Court of the parish of Terrebonne, *Roman*, J.

*Goode & Aycock*, for plaintiffs. *Connelly & Rightor*, for defendant and appellant.

MERRICK, C. J. The plaintiffs allege that they are the owners of a sugar plantation on Bayou Black, on which they usually make 250 hogsheads of sugar and 450 barrels of molasses ; that Bayou Black has always been a navigable stream, and used by petitioners in transporting to market their crop and in receiving supplies, and the only stream on which their crop can be shipped or their supplies received, and it is indispensable to petitioners it should be kept open and forever free to all persons whomsoever, the public having the sole and exclusive property therein ; that the defendant, *William A. Shaffer*, has constructed two locks in said bayou, one of which is in front of the plantation of *Hatch & Grinage*, and the other in front of the plantation of *Tobias Gibson*, both being below the plantation of petitioners ; that said locks which are unauthorized by law are a total obstruction to all free navigation of the bayou ; that petitioners understand that it is the intention of said *Shaffer* to charge tolls for all vessels and freight passing through said bayou, at the rate of thirty cents per hogshead for sugar, and fifteen cents per barrel for molasses, which petitioners are unwilling to pay ; that petitioners have demanded the removal of the locks ; that petitioners have had for several days past a boat load of molasses in the bayou at the upper lock ; that said *Shaffer* and his agent have refused to open the lock and let petitioners pass, and that petitioners' said molasses is still exposed in said boat, and that by said unlawful act of defendant petitioners are prevented from sending their crop to market and they have sustained damage in the sum of five hundred dollars, and will suffer irreparable loss if said locks are kept closed.

Petitioners pray for a writ of injunction to restrain said *Shaffer* from obstructing said bayou and demanding any toll from petitioner ; that the Sheriff be ordered immediately to open said locks ; that judgment be rendered against said defendant in the sum of five hundred dollars ; that the injunction be made perpetual, and said *Shaffer* be ordered to remove said locks and all other obstructions by him placed in said bayou, and on his failure to do so that they be done at his expense.

17

BOYKIN
*v.*
SHAFFER.

"The defendant answered by denying that the bayou is or ever has been a navigable stream according to the ordinary or legal import of the terms. On the contrary, he avers that said bayou was originally so choked up by logs brushwood, &c., as not to be navigable for the smallest water craft. That from time to time, since 1840, improvements in the bayou have been made, with the view of rendering it navigable, but as soon as the logs and other obstructions were sufficiently removed to admit of the passage of boats, the water drained off so rapidly and completely as to leave all that portion of it above the locks constructed by respondents almost entirely dry, and that said portion is not now susceptible of being navigated without the aid of those locks. Defendant further answers, that by a contract entered into between himself and the Barataria and Lafourche Canal Company, he engaged to build the two set of locks in question, and to receive in compensation therefor the right to levy toll on boats passing through the same; said right being stipulated for the term of seven years. That the company was and is authorized by its charter, by various regislative Acts, and by contracts with the State authorities, to improve the navigation of the bayou and to levy toll on it."

Defendant also excepts to plaintiffs' right to institute this action.

This exception was properly overruled. See 11 M. R., 621; 2 N. S., 317; 7 Rob., 442; 2 An. 770; 10 An., 431.

The testimony shows, that many years ago the Bayou Black had much more water in its channel than at present, but, that, then it was unnavigable except in high water for pirogues, which were enabled to get up the bayou by hauling them over the logs, rafts and other obstructions, and that since 1840 these obstructions have been removed, but, as a consequence, the water having nothing to retard the current flows out of the bayou and leaves it completely dry; that since these improvements by the State the bayou can be used for navigation only after high water occasioned by heavy rains, and then only for short periods. The proof is unanimous and clear, that the two locks are a positive advantage to the bayou and that without them the bayou would be comparatively unnavigable. The proof further shows, that *Lang*, who had the principal control of plaintiffs' plantation before these locks were built, was desirous that the defendant should build them, and was active in procuring favorable influences to act upon the defendant to build the locks.

The right of the State of Louisiana to authorize the building of these locks has been questioned. We have no hesitation in saying, that in our opinion the Act of Congress relied upon by plaintiffs' counsel was not intended to prevent the State from improving and rendering navigable bayous and other streams of the character of the Bayou Black.

Louisiana was admitted into the Union with this proviso, viz: "Provided, that it shall be taken as a condition upon which said State is incorporated in the Union, that the river Mississippi and the navigable rivers and waters leading into the same and into the Gulf of Mexico, shall be common highways, and forever free, as well to the inhabitants of said State as to the inhabitants of other States and Territories of the United States, without any tax, duty, impost or toll therefor, imposed by said State, and the above condition and also all other conditions and terms contained in the third section of the Act the title whereof is hereinbefore recited shall be considered, deemed and taken, fundamental conditions and terms upon which the said State is incorporated in the Union. Stat. at large, vol 2, pp. 642 and 703.

Without undertaking to construe the effect of the enactment upon the power of the State to charge tolls for improvements made by overcoming the natural obstacles of navigable streams it suffices in this case to say, that this statute was never intended to apply to streams only capable of an imperfect navigation in time of floods and very high water. Such streams or dry bayous must be considered as under the entire control of the State. Were the mere fact that a steamboat or flatboat had been a short distance up a stream or bayou in high water a sufficient ground for declaring it a navigable stream, every slight depression of the soil on the banks of the Mississippi would then become a navigable stream and should be opened for the benefit of rafts and boats, and the convenience of a few persons, to the total destruction of the planting interests on the banks of the river. It is well known that the State has for a number of years been closing the small bayous making out of the principal rivers and bayous, and thus redeeming large and valuable tracts of land. These bayous, which are of no value to the public, in high water might have been navigated by steamboats and other craft had it been the pleasure of the owners of such crafts to have employed their time in a navigation which would have been without profit to themselves or advantage to any one else.

Now the Bayou Black takes its rise in the vicinity of the residence of the plaintiffs, and it is shown that the locks placed upon it by the defendant so far from being an obstruction give the bayou all its value as a navigable stream. Assuming that the locks were authorized by the State, they advance the objects contemplated by the Act of Congress and furnish a permanent navigation alike open to the citizens of other States and the citizens of Louisiana, subject only to the payment of a reasonable remuneration to those by whose industry and means the navigation has been created. See the case of *State* v. *Orleans Navigation Co.*, 11 M. R., 324.

Now, if the locks are no obstruction to the navigation of the bayou, (the use to which the plaintiffs demand that the bayou shall be held exclusively subject,) they cannot demand that the locks shall be *destroyed* although it may not be shown that they have been erected under the authority of the State: all that plaintiffs could claim would be, that they should be allowed to use the bayou in its improved condition without paying toll.

We, therefore, come now to consider the question whether the defendant can charge toll. For it must be considered that the defendant could not without authority charge toll for the use of a lock which he had erected. Such a right would be a franchise which the sovereign alone could confer. If a private person should choose to repair a bridge upon a public highway, or if in the place of a dangerous bridge he should at his own cost build a substantial and safe one, he could not be prosecuted for obstructing the highway, but it would not follow that, because he had done no injury to the public way, he should be indemnified for what he had expended without being authorized by law to make such improvements.

If the defendant is authorized to charge the plaintiffs with toll, it is because the Legislature has authorized such levy of toll, or because the plaintiffs have authorized the construction of the locks, and have promised to pay toll for the use of the same.

Although one of the plaintiffs who had the principal management of the plantation, used his influence to induce the defendant to build the locks, it does not appear that he expressly promised to pay toll, or that he contem-

plated anything more than a donation in money, for what he considered his advantage from the building of the locks.

The case, therefore, rests exclusively upon the action of the Legislature. This compels us to glance at the legislation on this subject.

On the 6th of February, 1829, the Act of the Legislature was approved, incorporating the Barataria and Lafourche Canal Company, for the purpose of making a canal from the Mississippi to the Bayou Lafourche. This statute has no provision in relation to the Bayou Black.

The next day, February 7, 1829, an Act to incorporate the Lafourche and Terrebonne Navigation Company, was approved. This Act conferred powers upon the latter company by reference to those of the Barataria and Lafourche Canal Company.

The second section, however, is special, and provides that the operations of said Lafourche and Terrebonne Navigation Company shall extend to the improvement of the navigation of the Bayous Terrebonne, Black, Carpe and De Large, and for establishing a water communication by means of a canal or canals, from Bayou Lafourche to the Bayou Terrebonne, and from thence to the Bayous Black, Carpe, Caillou and De Large, and from one to the other, and through Bayou Black to Berwick's Bay ; provided, that the provisions of this Act shall not be so construed as to prevent the Barataria and Lafourche Canal Company from cutting a canal across the said water courses to communicate with Berwick's Bay, if the said company should find it convenient to cut such canal ; and all necessary powers are hereby granted to said Barataria and Lafourche Canal Company to increase their capital for the above object, and in case the said Barataria and Lafourche Company should not avail themselves of the privilege hereby granted, it shall be lawful to grant the same privilege to any other company.

In the third section is a clause authorizing the company, after the completion of certain works designated, *to demand and receive such additional toll as may be deemed advisable, not to exceed fifty cents per ton for each and every lock that may be absolutely necessary to construct on such canal or improvement ;* these tolls, however, being subject to a reduction whenever they should exceed fifteen per cent. on the capital paid in ; and it was further provided, *that said company shall be responsible for any damages that may be sustained in consequence of the want of sufficient embankments or locks on or in any canal or canals, bayou or bayous, opened or improved.*

The character of the improvements contemplated by the Legislature, was a continuous water communication from the Mississippi river to Berwick's Bay. The power was given to the Barataria company to complete the whole line, if they saw fit. But the Terrebonne and Lafourche Navigation Company also had the power of extending this line of improvements, for they were not only to improve the Bayous Terrebonne and Caillou, which are almost at right angles with the contemplated improvements of the Barataria company, but they were also to be permitted to connect the Lafourche with the Terrebonne, and these again with the Bayou Black and Berwick's Bay.

In 1833, the Legislature extended the charter of the Barataria company sixty-eight years ; it gave them the exclusive privilege for twenty years of digging canals, to open one or more ways of communication by water between the Mississippi river and Lafourche, and the lakes and intermediary bayous. See Act of 1833, p. 3.

In 1835, another Act of the Legislature was passed, by which the Treasurer of the State was directed to subscribe five hundred shares to the capital stock in the Barataria and Lafourche Canal Company. The Board of Internal Improvements was directed to employ one-third of the slaves owned by the State, on the Barataria and Lafourche Canal, and the union of the two companies was declared in these words:

Sec. 10. *Be it enacted,* &c., That a union of the Barataria and Lafourche Canal Company, together with the Lafourche and Terrebonne Navigation Company, be and is hereby authorized and effected, according the conditions stipulated in the articles of agreement signed by the President of each company, and deposited in the office of *Jules Mossey,* a Notary Public in the city of New Orleans." Act 1835, pp. 149–151. The importance of this act of union and consolidation is apparent, from the consideration of the fact, that the course of Bayou Black is in a westerly direction, and its channel might, it was then supposed, be made available for purposes of navigation.

After the consolidation of the two companies, the powers of both appear to have been exercised under the single title of the Barataria and Lafourche Canal Company, for, in 1843, we find the Legislature regulating the amount of fees which this company might receive over the line of the Lafourche and Terrebonne Navigation Company. The Act declares: "That Barataria and Lafourche Canal Company shall have power to levy and collect a toll on all vessels, boats or other crafts, of any description whatever, that may navigate between Houma and Thibodeauxville, on the Bayou Terrebonne or Canal near Thibodeauxville, which toll shall never exceed the following rates : on all vessels, boats, or any other crafts of any description whatever, eight cents per ton for every mile they shall navigate on said bayou and canal: provided said toll shall not exceed one dollar per ton, or seventy-five cents for crafts measuring less than one ton.

The next Act of the Legislature is the Act of 1846, relied upon by the plaintiff. We will consider this Act, after we have examined the remaining acts of recognition of the Barataria and Lafourche Canal Company, on the part of the State or its authorities.

In the month of July, 1850, *A. D. Wooldridge,* the State engineer, entered into a contract purporting to be with *George May,* President of the Barataria and Lafourche Canal Company, acting in his said capacity, by virtue of a resolution of the Board of Directors of said company, by which said engineer, on behalf of the State, in consideration of the sum of $55,000, in order to enable said company to complete the Barataria and Lafourche Canal contracted to build two locks on the Mississippi river; two on the east side of Bayou Lafourche; one lock on the west side of Bayou Lafourche; one lock between Bayou L'Eau Bleue and Terrebonne, and place a culvert under the canal between Bayous Terrebonne and Black, and to secure the State the repayment of said sum, the said company mortgaged "the canal of said company, in its whole extent, beginning at a point on the Mississippi river, about six miles above the city of New Orleans, thence running in a course westerly or south west, through the parishes of Jefferson, Lafourche Interior and Terrebonne, until it strikes Bayou Black in the parish of Terrebonne, with all the land lying alongside," &c.

It will thus again be seen, that the work here contracted to be done, as well as a portion of the canal mortgaged to the State, was within the original franchises of the Terrebonne and Lafourche Navigation Company.

BOYKIN
*v.*
SHAFFER.

This contract was entered into in virtue of two Acts of the Legislature; one approved December 20, 1848, to authorize the State Engineer to contract with the Barataria and Lafourche Canal Company "for the completion of said canal," and the other approved 20th of March, 1850, "to make further provisions for the completion of the Barataria and Lafourche canal." See Acts of 1848, p. 54 ; 1850, p. 188.

The contract itself, thus embracing a part of the line originally within the powers conferred on the Lafourche and Terrebonne Navigation Company, was expressly ratified by the Act of the Legislature, approved March 17, 1852, See Acts, 1852, p. 162. This Act made an appropriation of $12,000, in addition to the unexpended balances, "for the purpose of completing the Barataria and Lafourche Canal, in conformity with the contract of the State with said company, bearing date the first day of July, 1850."

On the thirtieth of April, 1853, another Act of the Legislature was approved, by which it was provided, that three Commissioners should be appointed on the part of the State, with full powers to alter, modify and render conformable to the Act of 20th of December, 1848, the contract between the State and the Barataria and Lafourche Canal Company ; twenty-three thousand dollars more was appropriated for the purpose of completing the Barataria and Lafourche canal, in compliance with the provisions of said Act, which sum, however, was not to be drawn from the Treasury in the event of a failure of the commissioners. See Acts of 1853, p. 296.

The three Commissioners appointed under this Act entered into a further agreement, by notarial act, with the Barataria and Lafourche Canal Company, by which said company acknowledged its indebtedness for the $55,000, and interest mentioned in the former act, and in consideration of the $23,000 to be paid the company, by the State as well as all the former unexpended balances of appropriations, the company agreed to relieve the State from the completion of the works undertaken by it, and engaged to do the work itself, with the additional works specified in said contract, viz :

*First.* To make the lock on the east side of Bayou Lafourche.

*Second.* To make and complete a lock on the Mississippi river, similar to the one now constructed on the Lafourche ; and

*Third.* To make and complete a lock on the Bayou Black; a lock on the Bayou Caillou, and a lock on the Terrebonne ; the lock on the Terrebone to be with three ways, with double gates, at the entrance of the canal—all of said locks to have double gates; to complete all dredging and excavating necessary to place the canal in good manageable order, to a depth of five feet. To secure the performance of the above, the company executed a bond in favor of the Governor of the State in the penal sum of $36,000.

The contract contained the further stipulation, that the locks on the Caillou and Terrebonne are to be so constructed, as not to injure or interfere with the owners of property on said bayous, but to improve the navigation.

A careful consideration of these statutes and Acts of the State, through its officers, as well as the Act of 1846, which will be mentioned in another place, shows that since the union of the two companies, the Barataria and Lafourche Canal Company, has been considered as invested with and acting for both of said companies, and that it was the object of the State, through the franchises granted the two companies, and which were managed under the name of the Barataria and Lafourche Canal Company, to carry through a line of water

communication 'from the Mississippi river to Berwick's Bay. This company, then, acting for itself and the Navigation Company, had the right to improve the navigation of Bayou Black, on the line of this water communication, by building locks and to charge tolls for the same, if we are guided by the statutes and acts above recited.

But there is another important statute in entire contrast with the preceding, and, if obligatory, the defendant must be enjoined from collecting tolls for the passage of the locks upon Bayou Black. This is the Act, approved May 25, 1846, entitled " An Act providing for the separation of the Lafourche and Terrebonne Navigation Company from the Barataria and Lafourche Canal Company, and determining the condition of said separation."

This Act the defendant contends was unconstitutional, and did not deprive the Barataria and Lafourche Canal Company of any of the franchises which it was exercising on behalf of the joint company.

The first section of the Act decrees that the Lafourche and Terrebonne Navigation Company be, and the same is hereby separated from the Barataria and Lafourche Canal Company as herein conditioned and defined: Provided, said separation be not objected to by a majority of the stockholders of either of said companies assembled for the purpose of deliberating on said separation, the voting of said stockholders on said subject being in conformity with the provisions of their respective charters, within twenty days after the promulgation of this Act.

It is contended by defendant's counsel that it was not in the power of the Legislature to decree a separation without some act on the part of the companies actively manifesting their assent to the separation. We are of this opinion. The two companies, two intellectual persons, having united their means and franchises under the sanction of the Legislature, had acquired certain joint rights which the Constitution permitted them to enjoy together; the two companies, and the stockholders of both companies collectively, had the right to continue their common affairs as long at least as it was their interest. The act of separation of the interests and property of these companies, like the separation of the interests of private persons, was *a partition*. The power to decree a partition and regulate the same is a judicial power, and does not belong to the legislative department of the Government. To establish this it is sufficient to refer to the uniform practice of the courts and the minute rules prescribed by the Civil Code for such proceedings, and the fact that, with the exception probably of the present instance, the Legislature has never attempted to exercise the power.

The Constitution of 1845 prohibited the Legislature from exercising judicial functions. Arts. 1 and 2. The Act referred to not only decrees the separation of the companies, the partition of the joint interests, but also assigns to each what each company shall take of the common effects. It decrees that the Lafourche and Terrebonne Navigation Company shall have the entire control of and power to improve the navigation of the canal connecting the Bayou Terrebonne with the Bayou Lafourche, from said canal to the point of intersection of the Barataria and Lafourche Company's canal near Houma with said bayou; that the Lafourche and Terrebonne Navigation Company shall exercise and enjoy within said prescribed limits all the rights and privileges and immunities granted by its original act of incorporation, *and the Barataria and Lafourche Canal Company shall cease to have any rights or exercise any authority what-*

BOYKIN
*v.*
SHAFFER.

*ever within* said limits; that the stock of the Lafourche and Terrebonne Navigation Company shall consist of stock subscribed for and paid in its original books before the junction of the two companies by the State and individuals, and also stock subscribed in 1838 for the improvement of the navigation of Bayou Terrebonne between Thibodaux and Houma, which last mentioned subscription is 123 shares, *and that the slaves, the dredging machine and town lots in Thibodaux now under the control of commissioners appointed in compliance with the contract of union of the two companies shall revert and belong to the* Lafourche and Terrebonne Navigation Company, and each company shall be bound for the payment of its respective debts, and it requests the President and Directors of the joint company to furnish to the *Directors* to be elected by the Lafourche and Terrebonne Navigation Company a statement of the amount of money received and disbursed since the union, and provides that the company which shall prove the debtor of the balance found, shall pay the same to the other company within a year, &c."

From this recital of the provisions of the act it is apparent that the Act of the Legislature decrees a partition, and assigns a part of the property held in common to one of the partners in full property. This Act of the Legislature has some analogy to the Act of 1841 by which the Legislature declared the Clinton and Port Hudson Railroad with all its fixtures, slaves, and appertenances, &c., forfeited to the State, on account of the non-payment of the interest on the bonds issued by the State. This court held that the decree of forfeiture was a judicial act, and the Act of the Legislature was in that respect unconstitutional. It is not less a judicial act to settle by proper evidence the rights of parties to state their accounts, charge either with the payment of debts, and allot to each his just portion of the common effects, and to decree each to be the owner of the part assigned him in full ownership. See *Perry et al.* v. *The Commissioners of the Clinton and Port Hudson Railroad Company*, 11 Rob. 413.

If that portion of the Act of 1846 making a partition between these companies is unconstitutional, all of the residue of the same which takes from the companies any of the franchises, and particularly that part which takes from the companies the right to construct locks and receive toll upon Bayou Black is unconstitutional as impairing the obligation of a contract. *Montpelier Academy* v. *George*, 14 L. R. 395.

The conclusions to which we have arrived in regard to the Act of 1846 are in accordance with the subsequent action of the Legislature and executive departments.

There is nothing to show that the Lafourche and Terrebonne Navigation Company ever attempted, after the union of the two companies, to exercise any of its franchises other than through the Barataria and Lafourche Canal Company, the officers of which appear to have been elected as the agents of both companies. And so it was understood in 1846, as we have already shown, for the Legislature attempted in that Act to provide for a separate election of officers for the Lafourche and Terrebonne Navigation Company and to reinstate that company as a distinct corporation. See 4th sec. of Act of 1846. If so the board of Directors elected under the title of the Barataria and Lafourche Canal Company were at that time exercising the functions of officers of the joint company.

This brings us to the consideration of the last proposition of plaintiffs coun-

sel, viz., that the Barataria and Lafourche Canal Company did not and could not transfer the right to build locks and levy tolls on Bayou Black to the defendant.

We know of no law which prevents a corporation from leasing portions of its works or even causing some of its works to be built with an understanding with the contractor that he shall be permitted to reimburse himself by the receipt of the tolls arising from the same. The contractor in such case becomes the agent of the company, and it is responsible for his acts. *Rabassa* v. *Orleans Navigation Company*, 5 L. R. 462.

On the question whether the Barataria and Lafourche Canal Company did actually authorize the defendant to build the locks and collect tolls, the proof is meagre, but we think this issue also, under the peculiar circumstance of this case, ought to be determined in favor of the defendant.

The company is cited in warranty by the defendant, and it has not repudiated his acts. The works done by him on the line of the improvements of the company are so considerable, and so obvious, that it cannot be supposed that they were done without the knowledge and consent of said company. Moreover *Lang*, one of the original plaintiffs in this suit, whilst he had the principal management of their joint plantation, took such an active interest in inducing the defendant to undertake these heavy works and make these large expenditures, that plaintiffs ought not, in the absence of all proof to the contrary, be permitted to deny that the defendant was authorized by the proper authority to build the locks.

We do not understand the plaintiff to complain that defendant charges a *higher* rate of toll than allowed by the acts of incorporation, but to contend that he is not entitled to maintain the locks which he has built nor collect any tolls.

It is, therefore, ordered, adjudged and decreed by the court that the judgment of the lower court be avoided and reversed, and that there be judgment in favor of the defendant, with cost of both courts, reserving to the plaintiffs and appellees the right, if any they have, to contest the legality of the tolls charged by the defendant.